IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                                    PLAINTIFF

VS.                          Case No. 2:20-cr-20017-PKH-MEF-5

ALBERTO LEDESMA,
a/k/a JUAN SOCORRO MACIEL-MARTINEZ,
a/k/a JUAN GONZALEZ,
a/k/a JUAN GONZALEZ-MARTINEZ,
a/k/a JUAN MACIEL,
a/k/a JUAN MARTINEZ-MACIEL                                                  DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court are the Defendant's Motion by a Person in Federal Custody to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 (ECF No. 722), his Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 725), and his Motion for Judicial Notice (ECF No. 728).  The United States filed a Response.  (ECF No. 729).  Defendant filed a Reply.  (ECF No. 730).  The case was referred to the undersigned, and an evidentiary hearing was held on August 11, 2023.  The matter is ripe for decision.

## I.      BACKGROUND

On August 26, 2020, Defendant, Alberto Ledesma ("Ledesma"), was indicted in a multi-defendant, multi-count Indictment and charged with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. § 846 (Count One), with knowingly and intentionally distributing more than 50 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) (Count

1

Seven), and with aiding and abetting in the distribution of more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 18 U.S.C. § 2 (Count Nine). (ECF No. 1). Ledesma was arrested on September 10, 2020 (ECF No. 141), and he appeared for arraignment on September 15, 2020, at which time he pleaded not guilty to the Indictment and Assistant Federal Public Defender James B. Pierce ("Pierce"), was appointed to represent him. (ECF Nos. 102, 104). A jury trial was scheduled for November 23, 2020. (ECF Nos. 102, 106).

On October 7, 2020, a First Superseding Indictment was returned by the Grand Jury. (ECF No. 166). The First Superseding Indictment added Ledesma's known alias names, Juan Socorro Maciel-Martinez, Juan Gonzalez, Juan Gonzalez-Martinez, Juan Maciel, Juan Martinez-Maciel and Juan Marciel. (*Id*. at 1). Ledesma was again charged with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. § 846 (Count One), with knowingly and intentionally distributing more than 50 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) (Count Seven), and with aiding and abetting in the distribution of more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 18 U.S.C. § 2 (Count Nine), but an allegation concerning the quantity of controlled substance was added to Count One, alleging that the amount involved in the conspiracy attributable to each defendant is more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii), and Ledesma was also charged with possession with intent to distribute more than 50 grams of a mixture or substance that contained a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) (Count Eighteen). (*Id*.). Ledesma was arraigned on the First

Superseding Indictment on October 15, 2020, and he pleaded not guilty to the charges brought against him. (ECF No. 221). Jury trial remained scheduled for November 23, 2020. (*Id.*).

On November 17, 2020, Ledesma appeared with appointed counsel for a change of plea hearing. (ECF No. 249). Pursuant to a written Plea Agreement, Ledesma pleaded guilty to Count Nine of the First Superseding Indictment charging him with aiding and abetting in the distribution of more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 18 U.S.C. § 2. (ECF Nos. 249; 250 ¶ 1).

An Initial Presentence Investigation Report ("PSR") was issued on January 13, 2021. (ECF No. 291). Ledesma was held responsible for 1.09 kilograms of actual methamphetamine. (*Id.*, ¶¶ 136-138). This drug quantity resulted in a base offense level of 34. (*Id.*, ¶ 143). A two-level enhancement was reported because Ledesma possessed a firearm in connection with the offense. (*Id.*, ¶¶ 138, 144). Another two-level increase was noted because Ledesma maintained a premise for the purpose of manufacturing or distributing a controlled substance. (*Id.*, ¶¶ 138, 145). It was also reported that Ledesma should be held accountable for being an organizer, leader, manager, or supervisor, as he directed a co-defendant to conduct a drug sale on his behalf, and he directed a confidential source to withhold $300 from his brother, and this resulted in a two-level enhancement for Ledesma's role in the offense. (*Id.*, ¶¶ 138, 147). After deducting three points for acceptance of responsibility, Ledesma's total offense level was reported to be 37. (*Id.*, ¶¶ 151-153). Ledesma's criminal history resulted in a criminal history score of one, placing him in criminal history category I. (*Id.*, ¶ 161). Based upon a total offense level of 37 and a criminal history category of I, the advisory guidelines imprisonment range was 210 to 262 months. (*Id.*, ¶ 190).

The United States had no objections to the initial PSR. (ECF No. 313). On January 26, 2021, Ledesma filed his objections to the initial PSR. (ECF No. 312). Ledesma objected to several

matters that did not affect the guidelines calculation, and he also objected to the two-level enhancement for being an organizer, leader, manager, or supervisor of others.  (*Id*.).

A final PSR was issued on February 16, 2021.  (ECF No. 352).  In an Addendum to the final PSR, the United States Probation Office noted certain corrections to the PSR based on some of Ledesma's factual objections, but that "the dynamic between the defendant and Maciel was not that of a partnership but in fact more accurately as an organizer/manager," so no changes were made to remove the two-level enhancement for Ledesma's role in the offense.  (ECF No. 352-1, p. 2).

Ledesma filed a Sentencing Memorandum on October 4, 2021.  (ECF No. 578).  He argued the Court should decline to impose a two-level enhancement under U.S.S.G. § 3B1.1(c) for being an organizer, leader, manager, or supervisor of the criminal activity, and he again likened the relationship with his brother, Efrain Maciel-Martinez, to a partnership.  (*Id*. at 2-5).  Ledesma also contended that the sentencing factors in 18 U.S.C. § 3553(a) supported a sentence of 135 months. (*Id*. at 5-8).

Sentencing was held on October 18, 2021.  (ECF Nos. 628, 732).  Ledesma informed the Court that he remained fully satisfied with the services of his counsel, AFPD Pierce.  (ECF No. 732, p. 4).  He confirmed that Pierce had reviewed the PSR documents with him, explained them to him, and answered his questions about them.  (*Id*. at 4-5).  Pierce reiterated his argument that the two-level enhancement for being an organizer leader, manager, or supervisor of the criminal activity should not apply because "this is more between my client and his brother, [and] is more in the nature of a partnership."  (*Id*. at 7-8).  The Government pointed out facts, aside from Ledesma's relationship with his brother, that supported the imposition of the two-level enhancement under U.S.S.G. § 3B1.1(c).  (*Id*. at 8-11).  Based on the undisputed facts in the PSR,

the Court found that Ledesma was a "high-level lieutenant" and a large distributor who fell just under the leader in the conspiracy. (*Id*. at 12-13). Ledesma, the Court stated, "had access to the direct supplier, he had access to large quantities, and he controlled dealers under him." (*Id*. at 13). After further discussion of Ledesma's involvement in the conspiracy to distribute large quantities of methamphetamine into Arkansas, the Court concluded that Ledesma "was very high-ranking in the organization, had a close arrangement with the leader of the DTO and had his own branch of the organization that he oversaw." (*Id*. at 16). Musing that Ledesma's role in the commission of the offense was "closer to a three or four-level increase than it is for no application whatsoever," the Court overruled Ledesma's objection to the two-level enhancement for his role in the offense. (*Id*. at 16-17). The Court then adopted and approved the final PSR without any changes or revisions. (*Id*. at 17). Full and final approval was given to the plea agreement. (*Id*.).

The Court next reviewed the Guidelines calculation, noting that Ledesma's Total Offense Level of 37, together with being in Criminal History Category I, placed Ledesma's advisory Guidelines range at 210-262 months imprisonment. (ECF No. 732, p. 19). After sentencing argument from the Government was presented, Pierce argued that a sentence of 180 months was sufficient, but not greater than necessary, to achieve the purposes of sentencing. (*Id*. at 26-28). Ledesma chose not to make a statement. (*Id*. at 28).

In addressing what the appropriate sentence should be for Ledesma, the Court discussed the aggravating and mitigating sentencing factors, as well as the need to avoid unwarranted sentencing disparity, and it found that a small downward variance was appropriate. (ECF No. 732, pp. 29-36). The Court then imposed a below-guidelines sentence of 188 months imprisonment, five years supervised release, a fine of $2,900, and a $100 special assessment. (*Id*. at 36-38). Judgment was entered on October 21, 2021. (ECF No. 639). No direct appeal from the conviction

and sentence was taken.

On December 28, 2022, Ledesma filed his original Motion to Vacate under 28 U.S.C. § 2255.[1]  The case was referred to the undersigned on January 3, 2023.  The Court directed Ledesma to file a standard form Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, signed under penalty of perjury, no later than February 4, 2023. (ECF No. 724).  Ledesma did so on January 12, 2023.  (ECF No. 725).  On January 30, 2023, Ledesma also filed a Motion for Judicial Notice in which he contends the Court was without jurisdiction to impose conviction and sentence due to mistaken identity.  (ECF No. 728).  The Government responded to Ledesma's Amended Motion on February 16, 2023.  (ECF No. 729). Ledesma filed a reply on March 13, 2023.  (ECF No. 730).  Counsel was appointed to represent Ledesma on March 30, 2023 (ECF No. 733), and an evidentiary hearing was held on August 11, 2023 (ECF No. 739).  The matter is ripe for decision.

## II.    DISCUSSION

"A prisoner in custody under sentence ... claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a

---

[1] The motion was received and docketed on January 3, 2023, but Ledesma declared under penalty of perjury that he placed the motion in the prison mailing system on December 28, 2022, so by virtue of the "prison mailbox rule" it is considered filed on that date.  Rule 3(d) of the Rules Governing Section 2255 Proceedings.  The filing dates of Ledesma's subsequent pleadings are also stated giving him the benefit of the "prison mailbox rule."

denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). A thorough review of Ledesma's Amended Motion and the files and records of this case, as well as careful consideration of the testimony and evidence presented at the evidentiary hearing, conclusively shows that Ledesma is not entitled to habeas relief, and the dismissal with prejudice of his Amended Motion is recommended for the reasons discussed below.

### A.      Timeliness

A one-year period of limitation applies to motions under 28 U.S.C. § 2255. This period runs from the latest of: (1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or, (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence. 28 U.S.C. § 2255(f).

The operative date in this case is "the date on which the judgment of conviction becomes final," as Ledesma raises no issue regarding any impediment created by Government action to making his motion, he asserts no right newly recognized by the Supreme Court made retroactive to cases on collateral review, and he makes no claim based on newly discovered evidence.

Judgment was entered in this case on October 21, 2021. (ECF No. 639). A direct appeal required giving notice of appeal within 14 days from the entry of the Court's Judgment. Fed. R. App. P. 4(b)(1)(A)(i). Ledesma did not file a notice of appeal, and his judgment of conviction thus became final on November 4, 2021. *See Murray v. United States*, 313 F. App'x 924 (8th Cir. 2009). From that date, Ledesma had one year, or until November 4, 2022, to timely file his § 2255 habeas petition. He filed his original § 2255 Motion on December 28, 2022, which was 54 days after the limitations period expired.

Timeliness is crucial to the consideration of a motion made under § 2255. *See, e.g., Alsup v. United States*, No. 09-3266-CV-S-RED, 2010 WL 376990, at pp. 2-3 (W.D. Mo. Jan. 26, 2010) (unpublished) (granting the Government's motion to dismiss petitioner's § 2255 motion where the motion was filed *one day* out of time). *See also United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) ("Foreclosing litigants from bringing their claim because they missed the filing deadline by one day may seem harsh, but courts have to draw lines somewhere, statutes of limitation protect important social interests (internal citation omitted), and limitation periods work both ways - you can be sure [petitioner] would not be pooh-poohing the prosecution's tardiness if he had been indicted one day after the statute of limitations expired for his crimes."). Here, of course, we are not dealing with Ledesma just missing the limitations deadline by one day, but by a period of 54 days. Consequently, unless either statutory or equitable tolling applies, the Court lacks jurisdiction to consider the merits of Ledesma's claims and his § 2255 Motion should be summarily dismissed.

### 1. Statutory Tolling

As noted above, the one-year period within which to file a § 2255 motion may, in an appropriate case, begin on the date on which an impediment created by governmental action in

violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; from the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or, from the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2255(f)(2)-(4).  Ledesma's § 2255 Motion offers nothing in support of any of these statutory grounds to extend the one-year limitations period.

### 2.  Equitable Tolling

The doctrine of equitable tolling is available to a § 2255 movant, but only "under limited conditions, for example, where extraordinary circumstances beyond a prisoner's control prevent the timely filing." *Gassler v. Bruton*, 255 F.3d 492, 495 (8th Cir. 2001); *United States v. Martin*, 408 F.3d 1089, 1092 (8th Cir. 2005).  The use of equitable procedures should be infrequent, *Flanders v. Graves*, 299 F.3d 974, 976 (8th Cir. 2002), and will not be applied if the habeas movant has not diligently pursued his rights, *Finch v. Miller*, 491 F.3d 424, 427 (8th Cir. 2007).  "Equitable tolling is an exceedingly narrow window of relief."  *Maghee v. Ault*, 410 F.3d 473, 476 (8th Cir. 2005).  The movant has the burden of establishing that equitable tolling should apply.  *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2015) (a petitioner asserting a right to equitable tolling bears the burden of establishing both elements of the doctrine).

The pleadings of a *pro se* prisoner litigant are reviewed under a less stringent standard than those drafted by an attorney and are provided a liberal construction.  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  Even so, a *pro se* litigant must still provide sufficient facts to support his claims.  *Saunders v. United States*, 236 F.3d 950, 952-53 (8th Cir. 2001).  Conclusory allegations,

unsupported by any specific facts, are insufficient to warrant relief. *Smith v. United States*, 677 F.2d 39, 41 (8th Cir. 1982).

Regarding the timeliness of his § 2255 Motion, Ledesma asks the Court to excuse his untimeliness "because of the COVID-19 Emergence of Omicron Variants Circumstances, Pandemic Interference by the Bureau of Prisons Institution (BOP) which Cost lockdowns, Restrictions during Transit, Transferred to Different Institution and at the Institution …" (ECF No. 725, p. 4). He states he had been incarcerated at four different BOP facilities before arriving at his final BOP destination, and that "[i]t was an unfortunate time to be convicted and sentenced and Transferred because of the COVI[D-]19 Pandemic was in full bloom." (*Id*. at 18). He states that many restrictions were placed on inmates across the country; that he was able to make only limited calls to one member of his family (the only one whose phone number he could remember); that he did not have his attorney's phone number, legal papers, case number, or any type of information regarding his case; and, that he could not get anyone trustworthy to translate for him. (*Id*.).

Upon careful consideration, the Court can find no basis for equitable tolling. Curiously, Ledesma put on no proof at the evidentiary hearing to support his assertion that equitable tolling should excuse the untimely filing of his § 2255 motion. Ledesma simply has not met his burden of demonstrating that his untimely filing was caused by some extraordinary circumstances beyond his control, nor that he was diligently pursuing his rights.

Restrictions imposed due to the COVID-19 pandemic, which effectively began in the United States in March 2020, "could—in certain circumstances—conceivably warrant equitable tolling" for § 2255 motions. *See Amerson v. United States*, No. 4:22-cv-1034-SRC, 2022 WL 17718615 (E.D. Mo. Dec. 15, 2022) (citing *United States v. Haro*, 2020 WL 5653520, at *4 (D.

Neb. Sept. 23, 2020)).   As the *Amerson* court noted, however, those "certain circumstances" involved individuals who were pursuing their rights diligently, and who would have timely filed for § 2255 relief "if not for obstacles caused by pandemic-related procedures." *Id.* (citing *Dunn v. Baca*, 2020 WL 2525772, at *2 (D. Nev. May 18, 2020) (finding that the pandemic had, among other things, halted ongoing investigations and prevented counsel from obtaining necessary records).   The *Amerson* court also observed that it, and other courts, had rejected requests for equitable tolling based on pandemic-related lockdowns and lack of law library access when there was no evidence the prisoner had diligently pursued his rights.   *Id.* at *2.   Thus, the COVID-19 pandemic does not automatically warrant equitable tolling for any movant who seeks it; the movant must establish that he was diligently pursuing his rights, and that the COVID-19 pandemic specifically prevented him from timely filing his § 2255 motion.   *United States v. Turner*, No. 6:18-cr-60015, 2021 WL 4256304, at *3 (W.D. Ark. Aug. 8, 2021) (internal citations omitted).

While Ledesma generally alleges that "many restrictions were placed on inmates across the country" because of the pandemic, he does not explain, nor has he submitted any proof, to show what restrictions were placed on *him* or how *his* ability to timely file a § 2255 motion was adversely affected.   He states that he was transferred to four different BOP facilities before arriving at his final BOP destination, but he does not explain how those transfers impeded his ability to make a timely filing.   He does not assert that these prison facilities were unable to accept and send out mail to the courts, and he has not presented any evidence showing that the COVID-19 pandemic or a law library lockdown prevented him from timely filing a § 2255 motion.   He also complains that he could not get "anyone trustworthy" to translate for him, but he does not state what efforts he pursued, and when, to obtain such assistance.

Further, Ledesma has not shown that he has diligently pursued his rights. In his § 2255 Motion, he claims (a) that his guilty plea was not knowingly and intelligently entered because his counsel led him to believe that he was pleading guilty to under 50 grams of methamphetamine, (b) that his counsel was deficient in failing to challenge the First Superseding Indictment on grounds of mistaken identity, and (c) that his counsel failed to file an appeal after being instructed to do so. Any facts supporting those claims would have been known to Ledesma at the time of sentencing, or within 14 days thereafter, and could have been raised during the one-year limitations period. He offers nothing to specifically demonstrate how some extraordinary circumstance beyond his control prevented the timely filing of his § 2255 Motion. Instead, he focuses his allegations on being subjected to vaguely stated pandemic and transfer-related restrictions. But as noted above, pandemic-related procedures, including lockdowns, law library closures, and lack of access to prison legal assistants and other resources, do not automatically warrant equitable tolling. *Amerson*, at *2-3; *Turner*, at *3. A § 2255 movant must establish that he was pursuing his rights diligently *and* the pandemic-related obstacle(s) stood in his way and prevented timely filing. Ledesma has failed to make such a showing.

Accordingly, Ledesma has failed to establish any factual basis to fit within the "exceedingly narrow window of relief" that equitable tolling provides, and his § 2255 Motion should be dismissed with prejudice as untimely.

Even if the Court were to consider Ledesma's claims, they fall short of supporting habeas relief.

### B.    Legal Standards for Ineffective Assistance of Counsel Claims

Ledesma asserts claims based upon allegations of ineffective assistance of counsel. To prove a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that

counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the deficient performance prong of the *Strickland* test, one must show that counsel's representation fell below the "range of competence demanded of attorneys in criminal cases." *Id*. at 688. Review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689. Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Courts also "do not use hindsight to question counsel's performance," but instead must analyze it according to counsel's situation at the time of the allegedly incompetent act or omission. *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991). If one fails to establish deficient performance by counsel, the Court need proceed no further in its analysis of an ineffective assistance of counsel claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To establish the prejudice prong of the *Strickland* test, one must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The United States Supreme Court has clarified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

The *Strickland* test applies to claims, like Ledesma's, that counsel was constitutionally ineffective for failing to file a notice of appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 477, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). A lawyer who disregards specific instructions from the

defendant to file a notice of appeal acts in a manner that is professionally unreasonable. *Id*. (internal citations omitted). This is so "because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice"; failure to do so cannot be considered a strategic decision, as "filing a notice of appeal is a purely ministerial task"; and "the failure to file reflects inattention to the defendant's wishes." *Id*. As for prejudice, "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Id*. at 484. Thus, an attorney's failure to file a notice of appeal after being instructed to do so by his client constitutes ineffective assistance of counsel entitling a petitioner to § 2255 relief, with no inquiry into prejudice or likely success on appeal being necessary. *Walking Eagle v. United States*, 742 F.3d 1079, 1082 (8th Cir. 2014) (citing *Barger v. United States*, 204 F.3d 1180, 1182 (8th Cir. 2000) and *Roe v. Flores-Ortega*, 528 U.S. at 478).

For such a claim to succeed, however, "the defendant must show that he manifestly instructed his counsel to file an appeal. *Walking Eagle*, 742 F.3d at 1082 (internal quotation and citation omitted). "A bare assertion by the petitioner that [he] made a request is not by itself sufficient to support a grant of relief, if evidence that the fact-finder finds to be more credible indicates the contrary proposition." *Id*.

### C.   Effect of a Guilty Plea

Ledesma pleaded guilty to the offense of conviction. When a guilty plea is entered, the focus of a subsequent collateral attack must remain limited to the nature of counsel's advice and the voluntariness of the guilty plea. *Bass v. United States*, 739 F.2d 405, 406 (8th Cir. 1984) (citing *Tollett v. Henderson*, 411 U.S. 258, 266 (1973)). As the Court in *Tollett* observed:

> ". . . a guilty plea represents a break in the chain of events which has
> preceded it in the criminal process. When a criminal defendant has

14

solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, *he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea* by showing that the advise he received from counsel was not within the standards set forth in *McMann*[2].

A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge . . . And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, (internal citation omitted) it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings." *Id*. at 267. (Emphasis added.)

The rationale and ruling of *Tollett*, while a decision concerning a state prisoner's habeas claims, has been adopted by the Eighth Circuit for application to motions made by federal prisoners under 28 U.S.C. § 2255. *See Bass*, 739 F.2d at 406.

The standard for determining the validity of a guilty plea remains whether it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *Machibroda v. United States*, 368 U.S. 487, 493 (1962); and *Kercheval v. United States*, 274 U.S. 220, 223 (1927)). "While a guilty plea taken in open court is not invulnerable to collateral attack in a post conviction proceeding, the defendant's representations during the plea-taking carry a strong presumption of verity and pose a 'formidable barrier in any subsequent collateral proceedings.'" *Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir. 1997) (quoting *Voytik v.*

---

[2] *McMann v. Richardson*, 397 U.S. 759, 771 (1970) (If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases.")

*United States*, 778 F.2d 1306, 1308 (8th Cir. 1985)).  A defendant has a heavy burden to overcome those admissions and show that his guilty plea was involuntary.  *Blackledge v. Allison*, 431 U.S. 63, 72-74 (1977).  When a defendant complains that ineffective assistance of counsel led him to accept a plea offer rather than proceeding to trial, a defendant must show that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.  *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

### D.      Ledesma's Claims of Ineffective Assistance of Counsel

### 1.      Being Misinformed Regarding the Quantity of Methamphetamine

In Ground Two of his § 2255 Motion, Ledesma claims that his guilty plea was not voluntarily, knowingly, and intelligently made because his counsel led him to believe that he was pleading guilty and being sentenced to distribution of *under* 50 grams of methamphetamine.  (ECF No. 725, p. 5).  He also alleges that during the change of plea hearing he was not told that he was pleading guilty to distribution of more than 50 grams of methamphetamine, nor that sentencing enhancements would apply to him.  (*Id.*).  His claim fails because it is contrary to the charging documents, the written Plea Agreement he signed, and the record.

In the Indictment issued on August 26, 2020, Ledesma was charged with conspiracy to distribute methamphetamine (Count One), with knowingly and intentionally distributing *more than* 50 grams of a mixture or substance containing a detectable amount of methamphetamine (Count Seven), and with aiding and abetting in the distribution of *more than* 50 grams of methamphetamine (Count Nine).  (ECF No. 1) (emphasis added).  Six weeks later, a First Superseding Indictment was returned which added Ledesma's known alias names and Ledesma was again charged with conspiracy to distribute methamphetamine (Count One), with knowingly and intentionally distributing *more than* 50 grams of a mixture or substance containing a detectable

amount of methamphetamine (Count Seven), and with aiding and abetting in the distribution of *more than* 50 grams of methamphetamine (Count Nine).  (ECF No. 166) (emphasis added).  The First Superseding Indictment also contained an allegation concerning the quantity of methamphetamine in Count One, alleging that the amount involved in the conspiracy attributable to each defendant is more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine, and Ledesma was also charged with possession with intent to distribute *more than* 50 grams of a mixture or substance that contained a detectable amount of methamphetamine (Count Eighteen).  (*Id*.) (emphasis added).  Thus, the charging documents make it abundantly clear that Ledesma was charged with offenses involving *more than*, not *less than* 50 grams of methamphetamine, and he was so advised at his arraignments on those charging documents.

On October 29, 2020, the parties entered into a written Plea Agreement that provided Ledesma would plead guilty to Count Nine of the First Superseding Indictment, charging him with aiding and abetting in the distribution of *more than 50 grams of methamphetamine* and, upon the Court's acceptance of the Plea Agreement and imposition of sentence, the Government agreed to dismiss the remaining counts and the forfeiture allegation.  (ECF No. 250, ¶ 1) (emphasis added).  The Plea Agreement contained an admission of the factual basis to support the guilty plea, including the following relevant facts:

- On December 19, 2019, a confidential informant working in conjunction with federal investigators contacted an individual they knew as Alberto Ledesma to arrange for the purchase of eight ounces of methamphetamine in exchange for $2,300.  Ledesma explained that he was out of state in North Carolina, but the informant could visit his house on MacArthur Drive in Fort Smith and his brother, Efrain Maciel-Martinez, would make the sale to the informant.
- The informant traveled to the residence at 4009 MacArthur Drive in Fort Smith and entered the home … Inside, Efrain Maciel-Martinez sold what

was represented to be eight ounces of methamphetamine to the informant in exchange for $2,000 …

- On December 30, 2019, a second controlled transaction was planned to pay Alberto Ledesma the outstanding $300 balance from the sale of methamphetamine on December 19, 2019.[3] … the informant traveled to Alberto Ledesma's location and provided him with the outstanding $300 balance.

- The suspected methamphetamine was sent to the DEA Laboratory for testing, which confirmed the substance to be 216.4 grams of actual methamphetamine.

- On September 10, 2020, the individual the informant knew as Alberto Ledesma was fingerprinted and it was determined that "Alberto Ledesma" was an alias, and that the defendant is also known by the following names: Juan Socorro Maciel-Martinez; Juan Gonzalez; Juan Gonzalez-Martinez; Juan Maciel; Juan Martinez-Maciel; and Juan Marciel.

- Based upon the facts above, the defendant agrees that the United States could prove beyond a reasonable doubt that he and Efrain Maciel-Martinez, aided and abetted by each other, distributed *more than fifty (50) grams of methamphetamine.*

(*Id.*, ¶ 4) (emphasis added).

The Plea Agreement also contained a stipulation on drug quantity in which the parties agreed that the most readily provable quantity of drugs for which the Defendant should be held accountable is at least 500 grams of methamphetamine (actual), but less than 1.5 kilograms of methamphetamine (actual). (ECF No. 250, ¶ 11). The Plea Agreement informed Ledesma of the maximum penalties, including a maximum term of imprisonment for life, and a mandatory minimum term of imprisonment for 10 years, and it made clear that while the Court shall consult and take into account the United States Sentencing Guidelines in determining the sentence, the Court was not bound by the Guidelines and may sentence the Defendant to any sentence within the statutory range. (*Id.*, ¶¶ 12, 16). Ledesma acknowledged that discussions had taken place concerning the possible guideline range which might be applicable to his case, and he agreed that such discussions merely attempted to guess at what appeared to be the correct guideline range and

---

[3] The written Plea Agreement states December 19, 2010, which appears to be a typographical error.

did not bind the Court; that the actual range may be greater than contemplated by the parties; and that if the guideline range was greater than the parties expected, Ledesma agreed that did not give him the right to withdraw his guilty plea.  (*Id.*, ¶ 17).  The Plea Agreement also specifically informed Ledesma that relevant conduct would be considered in determining his sentence.  (*Id.*, ¶ 18).  He was advised that "relevant conduct" included "the conduct that is the subject of this investigation for which he has not been charged up to the date of this Agreement, and/or which is the basis for any of the counts which will be dismissed pursuant to this agreement."  (*Id.*).

By signing the written Plea Agreement, Ledesma represented that he had read the agreement and carefully reviewed every part of it with his counsel; that he fully understood the agreement, and that no promises, agreements, understandings, or conditions had been made or entered into in connection with his decision to plead guilty except those set forth in the agreement; that he was satisfied with the legal services provided by defense counsel in connection with the plea agreement and matters relating to it; and that he entered into the Plea Agreement "freely, voluntarily, and without reservation."  (ECF No. 250, ¶ 28).  He further acknowledged that the written Plea Agreement constituted the entire agreement by the parties, and that no oral agreements or promises had been made to induce him to plead guilty in the case.  (*Id.*, ¶ 30).

At his change of plea hearing held on November 17, 2020, Ledesma stated that he was fully satisfied with the services, advice, and counsel provided to him by his court-appointed counsel, AFPD Pierce.  (ECF No. 731, p. 6). After reviewing the charges brought against Ledesma in the First Superseding Indictment, to which he had previously pleaded not guilty, the Court inquired if Ledesma now wished to change his plea to guilty as to Count IX which "charges you with aiding and abetting the distribution of *more than* 50 grams of actual methamphetamine," to which Ledesma responded, "yes, that's correct."  (*Id.* at 8) (emphasis added).  He confirmed that

he asked "a lot of questions" of his counsel about the written Plea Agreement, that his counsel explained everything to him, and he had no questions regarding the Plea Agreement. (*Id*.). He acknowledged having signed the written Plea Agreement. (*Id*. at 9). He stated that nobody had attempted in any way to force him to plead guilty, and he was pleading guilty freely and voluntarily because he was, in fact, guilty of the offense. (*Id*. at 9-10). He further informed the Court that no one had promised him anything other than what was provided for in the Plea Agreement, and that no one had threatened him in any way to get him to enter into the Plea Agreement. (*Id*. at 10).

The Court informed Ledesma of the potential consequences of a plea of guilty on the charge of aiding and abetting in the distribution of more than 50 grams of actual methamphetamine, including a mandatory minimum sentence of ten (10) years imprisonment and a maximum term of imprisonment up to life, and Ledesma stated his understanding of the consequences. (ECF No. 731, pp. 11-12). The Court made clear that despite any term or provision of the agreement, the Court retained the discretion and authority to impose any proper sentence within the applicable statutory minimum and statutory maximum, and Ledesma stated his understanding of the Court's authority. (*Id*. at 13). He stated that his counsel had reviewed the Sentencing Guidelines with him, and he expressed an understanding that the sentence imposed by the Court could be different from any estimate his attorney may have given him. (*Id*.). He also stated an understanding that relevant conduct could be considered at sentencing. (*Id*. at 14). Having reviewed those matters, and more, with him, the Court asked Ledesma if he had any questions about the Plea Agreement, and he responded, "No, Your Honor. Everything is clear." (*Id*. at 16).

Of particular significance to his claim of being misled by his counsel about pleading guilty to "less than" instead of "more than" 50 grams of actual methamphetamine, Ledesma acknowledged having reviewed the admission of the factual basis in support of a guilty plea

contained in the Plea Agreement (ECF No. 250, ¶ 4, stating 216.4 grams of actual methamphetamine), and the stipulation on drug quantity set forth in the Plea Agreement (*Id*., ¶ 11, stating that the most readily provable amount of drugs Ledesma should be held accountable for is at least 500 grams of actual methamphetamine, but less than 1.5 kilograms of actual methamphetamine). (ECF No. 731, pp. 16-17). Following a recitation by the Government of the independent factual basis to support his guilty plea, Ledesma stated that he understood, "[a]nd that is my name," and he agreed the Government could prove those facts if the case were to proceed to trial. (*Id*. at 18-19). Defense counsel also agreed that those facts could be proven at trial. (*Id*. at 19). Ledesma then entered a plea of guilty to Count IX of the First Superseding Indictment charging him with aiding and abetting in the distribution of *more than* 50 grams of methamphetamine. (*Id*. at 20).

At the evidentiary hearing held on August 11, 2023, AFPD Pierce testified that Rafael Maquez, the FPD's investigator and Spanish language interpreter, was present for all client meetings with Ledesma. When asked if aspects of the Plea Agreement could be lost in translation, AFPD Pierce explained his process for going over the Plea Agreement with Ledesma to ensure that he understood it. Mr. Marquez also testified, stating that he is a state certified Spanish language court interpreter, and explaining that he read the Plea Agreement in its entirety to Ledesma. He testified that he went over the Plea Agreement paragraph by paragraph with Ledesma, stopping at the end of each page to ask if Ledesma had any questions. He did not recall Ledesma having any questions.

The record before the Court shows that Ledesma read the written Plea Agreement and discussed its ramifications with his counsel. He understood the Plea Agreement and its potential consequences. He admitted this to the Court at his change of plea hearing, and he expressed

satisfaction with his counsel.  The Plea Agreement informed Ledesma of the maximum penalties, including a mandatory minimum sentence of ten (10) years imprisonment and a maximum of life imprisonment; that the United States Sentencing Guidelines would be considered by the Court at sentencing; that no specific sentence was promised; and, that relevant conduct could be considered by the Court at sentencing.  Ledesma was explicitly told both in the written Plea Agreement and by the Court at the change of plea hearing that the charge to which he agreed to plead guilty was aiding and abetting the distribution of *more than* 50 grams of actual methamphetamine.  Thus, Ledesma's assertion that he was "led to believe" that he was pleading guilty and being sentenced to distribution of *under* 50 grams of methamphetamine is blatantly contradicted by the record, and he has offered nothing more that conclusory allegations that his guilty plea was not voluntary and knowing.

Ledesma's claim also fails because it "founders on abundant circuit precedent holding that inaccurate advice of counsel about the sentencing guidelines or likely punishment does not render involuntary a defendant's decision to plead guilty, so long as the defendant is informed of the maximum possible sentence permitted by statute and the court's ability to sentence within that range." *United States v. Quiroga*, 554 F.3d 1150, 1155 (8th Cir. 2009).  Ledesma was so informed, both in the written Plea Agreement and by the Court at his change of plea hearing.

Finally, to show prejudice pursuant to *Hill v. Lockhart*, *supra*, Ledesma must show a reasonable probability that, but for his counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.  Ledesma makes no such allegation or showing.  He does not claim to be innocent, stating only that "I never dealt anything more than TWO Ounces (52 grams of Mix) not pure" (ECF No. 725, p. 17), but this assertion is clearly undermined by the record.  Therefore, Ledesma has failed to show any prejudice arising from his claim that counsel

22

"led him to believe" that he was pleading guilty to an offense involving less than 50 grams of actual methamphetamine.

In sum, Ledesma has not shown that his guilty plea was involuntary, unknowing, and unintelligent; he has not shown deficient performance by his counsel in connection with the plea negotiation; nor has he shown any prejudice resulting from any alleged ineffective assistance of counsel in connection with the plea negotiation.  Ledesma's second ground for § 2255 habeas relief should be denied.

### 2.       Failure to Challenge the Indictment

In Ground Three of his § 2255 Motion, Ledesma asserts that his counsel was constitutionally deficient for failing to challenge the Indictment based on mistaken identity.  (ECF No. 725, p. 7).  He alleges that he told his attorney that "Alberto Ledesma" was the name of the person renting a house to the Defendant, and that his real name is J. Socorro Maciel Martinez. This failure of counsel, he claims, caused the wrong person to be convicted and sentenced.  (*Id.*). This claim finds no support in the record and should be denied.

The record demonstrates that throughout these proceedings the Defendant has acknowledged himself to be Alberto Ledesma.  The original Indictment filed on August 26, 2020, listed Alberto Ledesma as one of 18 defendants in the case.  (ECF No. 1).  When asked at his arraignment if he was Alberto Ledesma, he responded in the affirmative.   In his Financial Affidavit, sworn under penalty of perjury, he signed his name – Alberto Ledesma.  (ECF No. 103) (under seal).   On October 7, 2020, a First Superseding Indictment was issued which listed Ledesma's known alias names, including Juan Socorro Maciel-Martinez, Juan Gonzalez, Juan Gonzalez-Martinez, Juan Maciel, Juan Martinez-Maciel, and Juan Marciel.  (ECF No. 166).  At his October 15, 2020, arraignment on the First Superseding Indictment, he again responded

affirmatively when asked if he was Alberto Ledesma.   A consent to hold proceedings by videoconference was also signed by the Defendant as Alberto Ledesma.  (ECF No. 245).  The written Plea Agreement shows the Defendant's name as Alberto Ledesma, also stating his known alias names, and it is signed by Alberto Ledesma.  (ECF No. 250, p. 12).  At the change of plea hearing held on November 17, 2020, during which the Court consistently referred to and addressed the Defendant as Alberto Ledesma, at no time did Ledesma state that he was not, in fact, Alberto Ledesma.  (ECF No. 731).

During the evidentiary hearing, AFPD Pierce testified that he investigated whether the Defendant was Alberto Ledesma, but he did not recall being told that "Alberto Ledesma" was the name of the person leasing the residence to Defendant.   Notably, AFPD Pierce testified that Ledesma never denied that he was the person who committed the criminal acts set forth in the indictments.  He stated that if the identity issue had presented a defense, they would have pursued it.  He referred to Paragraph 4(g) of the Plea Agreement which stated that:

> On September 10, 2020, the individual the informant knew as Alberto Ledesma was fingerprinted and it was determined that "Alberto Ledesma" was an alias, and that the defendant is also known by the following names: Juan Socorro Maciel-Martinez; Juan Gonzalez; Juan Gonzalez-Martinez; Juan Maciel; Juan Martinez-Maciel; and Juan Marciel.

Mr. Marquez testified that during their investigation of the case, he found another person with the name "Alberto Ledesma," but the Defendant never told him he was leasing the house from "Alberto Ledesma."  Nothing uncovered during their investigation, he said, revealed that the Defendant was not the person who committed the crimes charged in the indictments.

Further, "[m]isnomers generally are mistakes of form that may be corrected by amending the indictment."  *United States v. Mason*, 869 F.2d 414, 417 (8th Cir. 1989) (internal citations omitted); *United States v. Reed*, Crim. No. 17-253 (MJD/BRT), 2018 WL 4233836, *7 (D. Minn.

July 11, 2018).  A misnomer in an indictment is fatal to the indictment only when the defendant

can show that it prejudices him in some way or that he is, in fact, not the individual indicted by the

Grand Jury.  *United States v. Sorey*, No. CR20-4048-LTS, 2021 WL 2689842, *2 (N.D. Iowa June

30, 2021) (citing *Poffenbarger v. United States*, 20 F.2d 42, 44 (8th Cir. 1927)).

As noted above, the original Indictment (ECF No. 1) listed the Defendant's name as

"Alberto Ledesma," whom the Government believed the person who committed the crimes was

known to be.  Ledesma states in his § 2255 Motion that once he was arrested the U.S. Marshals

found his wallet containing his Mexican identification showing his name as "J. Socorro Martinez."

(ECF No. 725, p. 16).  According to the undisputed facts set forth in the PSR:

> Once at the Sebastian County Detention Center, Ledesma initially
> refused to be fingerprinted; however, he denied that his name was
> Alberto Ledesma.  Once fingerprinted, it was determined that
> Ledesma was an alias, and he was known by the following names:
> Juan Socorro Maciel-Martinez; Juan Gonzalez; Juan Gonzalez-
> Martinez; Juan Maciel; Juan Martinez-Maciel; and Juan Marciel.

(ECF No. 352, ¶ 135).  Soon thereafter, the Government filed its First Superseding Indictment

naming "Alberto Ledesma" along with his known a/k/a designations, including the name "Juan

Socorro Maciel-Martinez," which Ledesma now claims to be his true identity.  (ECF No. 166).  By

including Ledesma's known a/k/a designations in the First Superseding Indictment, including

"Juan Socorro Maciel-Martinez," it allowed the Grand Jury to connect the person known to law

enforcement as "Alberto Ledesma" and the name "Juan Socorro Maciel-Martinez," and it clearly

informed Ledesma of the nature and cause of the accusations against him and assured that the

wrong person was not indicted.  And, as both AFPD Pierce and Investigator/Interpreter Marquez

testified at the evidentiary hearing, Ledesma never denied that he was the person who committed

the criminal acts alleged in the indictments.  Ledesma has, on the other hand, provided nothing to

establish that he is not the individual who committed the offenses charged in the indictments or that the misnomer has caused him prejudice.

There was no legitimate reason for defense counsel to challenge the First Superseding Indictment based on mistaken identity. It cannot be ineffective assistance not to raise a meritless argument. *Larson v. United States*, 905 F.2d 218, 219 (8th Cir. 1990); *Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994). As such, Ledesma's third ground for § 2255 habeas relief should be denied.

### 3.       Failure to File an Appeal

Ledesma's final ground for relief is his claim that his counsel failed to file a notice of appeal after he had instructed counsel to do so. (ECF No. 725, p. 8). Once more, the record belies Ledesma's claim. There is no dispute that a notice of appeal was never filed. The credible evidence, however, shows that no appeal was filed because Ledesma, after consultation with counsel, voluntarily chose not to appeal.

Ledesma alleges that one day after his sentencing his counsel called him and "asked me if I wanted to appeal, which I stated yes, please file my appeal, which Attorney stated he would do." (ECF No. 725, p. 13). He claims he then "heard nothing" from his counsel nor from any court. (*Id*.). Notably, Ledesma did not testify at the evidentiary hearing. Both AFPD Pierce and FPD Investigator/Interpreter Marquez testified at the evidentiary hearing about the circumstances leading to Ledesma's decision not to appeal.

AFPD Pierce testified that an appeal is discussed with every client at various times during a case, including before a change of plea hearing, before sentencing, and after sentencing. As a general matter, he said, they appeal if asked to appeal, or even if a defendant says nothing about an appeal. The only time they do not appeal, he stated, is when a client chooses not to appeal.

According to Marquez, Ledesma initially asked to appeal. This was communicated to AFPD Pierce, who then met with Ledesma. At that meeting, which Marquez was present for, Ledesma changed his mind about appealing and decided not to appeal.

AFPD Pierce testified that after discussing possible appeal issues, Ledesma voluntarily chose not to file an appeal. A Notice of Non-Appeal form was presented to Ledesma, and Ledesma signed it on October 28, 2021, which was ten days after sentencing and seven days after entry of the Court's Judgment. (Gov't. Exhibit 2). The Notice of Non-Appeal form, which contains both a section in English and another in Spanish, states:

> "I am a defendant in this case, and I have now been sentenced. I know that I have the right to appeal to the 8th Circuit Court of Appeals. I have discussed my case with my attorney and I have decided not to pursue an appeal." (Gov't. Exhibit 2).

Marquez testified that there were no language problems in communicating with Ledesma about the Notice of Non-Appeal form.

Pierce recalled that Ledesma may have contacted his office again a couple of months later. Marquez remembered that Ledesma called their office on December 9, 2021, asking about an appeal. At that point, however, it was too late for Ledesma to change his mind again and pursue an appeal.

A notice of appeal was not filed because, as the credible evidence of record demonstrates, Ledesma had voluntarily decided not to pursue an appeal. Contrary to Ledesma's allegation that he asked his counsel to file an appeal, the evidence of record clearly and unequivocally shows otherwise. After initially indicating a desire to appeal, Ledesma conferred with counsel, changed his mind about an appeal, and he signed a written Notice of Non-Appeal form. He conveniently failed to mention that in his § 2255 Motion, and he offered no testimony on the issue at the evidentiary hearing. He has failed to establish that he manifestly instructed his counsel to file an

27

appeal, and his bare assertion that he made such a request is not by itself sufficient to support a grant of relief. *See Walking Eagle*, 742 F.3d at 1082. Accordingly, I do not find any deficient performance by AFPD Pierce in failing to file a notice of appeal, and this claim should be denied.

### E.    No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C.§ 2253 only if the applicant has made a substantial showing of the denial of a constitutional right. A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case at present. *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

For the reasons discussed above, I conclude that Ledesma has not made a substantial showing of the denial of a constitutional right, and any request for a Certificate of Appealability should be denied.

### III.    CONCLUSION

For the reasons and upon the authorities discussed above, Ledesma's Motion by a Person in Federal Custody to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 (ECF No. 722), as amended (ECF No. 725) and supplemented (ECF No. 728), is untimely, and no statutory or equitable tolling applies, so the Court lacks jurisdiction to consider the Motion.

Even if the Court were the Court to consider Ledesma's claims for federal habeas corpus relief, they lack merit and are undermined by the evidence of record. Ledesma's claim that his guilty plea was not voluntarily, knowingly, and intelligently made because his counsel led him to believe that he was pleading guilty and being sentenced to distribution of *under* 50 grams of methamphetamine fails because it is contrary to the charging documents, the written Plea

28

Agreement he signed, and the record.  His claim of ineffective assistance of counsel based on mistaken identity likewise finds no support in the record and should be denied.  Lastly, his claim that counsel failed to file a notice of appeal after being requested to do so is contradicted by the record.

It is recommended that Ledesma's Motion by a Person in Federal Custody to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 (ECF No. 722), his Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 725), and his Motion for Judicial Notice (ECF No. 728) be **DISMISSED with PREJUDICE**.

It is further recommended that any request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely written objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 24th day of October 2023.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE